TH/ALK:VAZ/KRA
F. #2026R00061

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

        - against -

JOSHUA NASS,

             Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

**TO BE FILED UNDER SEAL**

C O M P L A I N T   A N D
A F F I D A V I T   I N   S U P P O R T
O F   A R R E S T   W A R R A N T

(18 U.S.C. §§ 1951(a), 2)

Case No. 26-MJ-54

EASTERN DISTRICT OF NEW YORK, SS:

JOHN-PATRICK RABENA, being duly sworn, deposes and states that he is a Special Agent with the Federal Bureau of Investigation, duly appointed according to law and acting as such.

In or about and between December 2025 and March 2026, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JOSHUA NASS, together with others, did knowingly and intentionally attempt to obstruct, delay and affect commerce, and the movement of articles and commodities in commerce, by extortion, in that NASS and others attempted to obtain property, to wit: money, from John Doe 1 and John Doe 2, individuals whose identities are known to the deponent, with their consent, which consent was to be induced by wrongful use of actual and threatened force, violence and fear.

(Title 18, United States Code, Sections 1951(a) and 2)

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.      I am a Special Agent with the Federal Bureau of Investigation (the "FBI"), and I have been since 2018.   I investigate violent criminal enterprises and crimes of violence, including extortion schemes.   During my tenure at the FBI, I have participated in numerous investigations of violent criminals and criminal enterprises, and I have used a variety of investigative techniques, such as interviews of witnesses, cooperating witnesses, and confidential informants; physical surveillance; reviews of telephone records; and warrants to search physical premises, cellphone data, social media accounts, and cell-site location data.

2.      I have personally participated in the investigation of the offense discussed below.   I am familiar with the facts and circumstances of this investigation from, among other sources of information: (a) my personal participation in this investigation; (b) my training and experience; (c) my review of documentary evidence obtained during the investigation; and (d) information obtained from other law enforcement officers, witnesses and other sources.

3.      Since approximately January 2026, law enforcement authorities, including the FBI, have been conducting an ongoing investigation into an extortion scheme orchestrated by the defendant JOSHUA NASS and targeted at, among others, John Doe 1 and John Doe 2.   As set forth in more detail below, the investigation has revealed that NASS directed a confidential witness (the "Confidential Witness," or "Witness") to threaten, intimidate, and assault John Doe 1 and one of his sons, John Doe 2, in an effort to force John Doe 1 and John Doe 2 to pay NASS

---

[1]      Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

approximately $500,000.[2]  As detailed more fully below, NASS and the Confidential Witness, who is based in Staten Island and Brooklyn, have communicated and met in person multiple times from approximately January 2026 to March 2026.  At law enforcement's direction, the Confidential Witness has recorded various conversations and meetings with NASS.

4.  According to the Confidential Witness and as reflected in WhatsApp messages I reviewed as part of this investigation, the defendant JOSHUA NASS first contacted the Confidential Witness on or about January 6, 2026.[3]  Thereafter, on or about January 8, 2026, the Confidential Witness and NASS met in New York City.  During that meeting, a recording of which I have reviewed, NASS told the Confidential Witness, among other things, that John Doe 1 owed NASS $500,000 for what NASS described as lobbying services rendered on behalf of John Doe 1 from approximately December 2025 to January 2026; that John Doe 1 had told NASS that he did not have the money; and that John Doe 2 had asked NASS for a "payment plan," which NASS viewed as an "insult."  NASS further stated, among other things, that NASS had found "bank statements" for what he believed to be an insurance policy associated with John Doe 2, and that NASS therefore believed that John Doe 2 could pay the money.  NASS further

---

[2]  The Confidential Witness is cooperating with law enforcement in the hopes of being offered a cooperation agreement and possible immigration benefits.  The Confidential Witness was previously convicted of racketeering, for which he was sentenced to 46 months in prison, and subsequently possessed a firearm as a convicted felon.  The information provided by the Confidential Witness has been corroborated by, among other sources of evidence, records, law enforcement surveillance, and other independent information obtained by law enforcement pursuant to the investigation.

[3]  Where statements of others are set forth, except as otherwise noted, they are set forth in sum and substance and in part.  Additionally, the defendant JOSHUA NASS and the Confidential Witness communicate in both English and Russian.  Excerpts of recorded conversations contained herein are based on draft transcripts and working interpretations of Russian statements by FBI linguists.  Throughout this Complaint, use of the term "UI" in the draft transcripts means that the audio was unintelligible to the reviewing linguist.

stated, among other things, that he intended to "make him [John Doe 1] pay for every penny he owes me," but that NASS was "not going to no court" because that was "not how [NASS] work[ed]."

5.      During the January 8 meeting, the defendant JOSHUA NASS and the Confidential Witness discussed the Confidential Witness approaching John Doe 2 at his home to intimidate John Doe 2 into paying NASS.   To that end, NASS informed the Confidential Witness where John Doe 2 lived and stated that he would send the Confidential Witness John Doe 2's address after their meeting.   As reflected in the below draft transcript excerpt, NASS told the Confidential Witness that the Confidential Witness should "do anything and everything" to force John Doe 2 to pay NASS:

| | |
|---|---|
| Witness: | Let's say—give me the address, let me see and, er—er—listen, if I need to sock him a few times . . . |
| NASS: | I will give you the right to do anything and everything, but I am telling you this is a scared person.   He's already scared. |

6.      During the same meeting, the defendant JOSHUA NASS and the Confidential Witness also discussed the Confidential Witness's fee for helping NASS collect from John Doe 2, as reflected in the below draft transcript excerpt:

| | |
|---|---|
| NASS: | Ok.   How much—how much do you want for this? |
| Witness: | I don't know how this, how this work . . . |
| NASS: | This will not be once.   Just so you know. |
| Witness: | Let's say, ten, twenty.   Ten.   Let's say ten. |
| NASS: | Ok. |

[ . . . ]

| | |
|---|---|
| Witness: | Only I gonna need some expense to go, monthly-shmonthly, you know, gas [UI] |

| | |
|---|---|
| NASS: | Just tell me how much. |
| Witness: | So, about— |
| NASS: | Tell me how much. |
| Witness: | Ok, let's do three. |
| NASS: | Deal.  Errr— |
| Witness: | Ok, but let's . . .  Don't worry about it.  Send me the info.  Let me do my homework. |
| NASS: | Ok. |

Based on my training and experience, as well as my participation in the investigation, I submit that, during the above-excerpted exchange, NASS agreed to pay the Confidential Witness at least $10,000 ("ten"), with an initial payment of $3,000 ("three"), and the Confidential Witness agreed to start planning the extortion for NASS ("Send me the info.  Let me do my homework").

7.      Later on January 8, 2026, the defendant JOSHUA NASS sent the Confidential Witness two addresses in Rockland County, New York and a phone number. NASS indicated that John Doe 2 was associated with those addresses, and that the phone number belonged to John Doe 2.  A review of law enforcement databases shows that John Doe 2 is in fact associated with the addresses and phone number provided by NASS to the Confidential Witness.  The following day, NASS confirmed to the Confidential Witness that John Doe 2 resided at one of those addresses.

8.      According to the Confidential Witness, and as reflected in text messages between the Confidential Witness and the defendant JOSHUA NASS that I have reviewed, on or about January 13, 2026, NASS instructed the Confidential Witness to visit John Doe 2 in order to compel him to pay NASS what NASS claimed to be owed.  Later that night, the Confidential Witness told NASS that the Confidential Witness had gone to John Doe 2's residence, but that

John Doe 2 had shut the door on the Confidential Witness after the Confidential Witness told John Doe 2 about being sent by NASS.[4]

9.    Thereafter, on or about January 29, 2026, the defendant JOSHUA NASS and the Confidential Witness met in person in New York City to discuss the Confidential Witness's efforts to collect the money purportedly owed to NASS from John Does 1 and 2. During the January 29 meeting, NASS paid the Confidential Witness $3,000 in cash for the Confidential Witness's services up to that point, which the Confidential Witness provided to law enforcement.

10.    According to the Confidential Witness, during the meeting, the defendant JOSHUA NASS stated that he wanted John Doe 2 to understand that NASS would not accept John Doe 2's failure to pay NASS for the money owed.   NASS instructed the Confidential Witness to physically assault John Doe 2 and to threaten John Doe 2.   NASS agreed to pay the Confidential Witness $15,000 for doing so, with a $5,000 up front payment and the remaining $10,000 after John Doe 2 paid NASS.

11.    As reflected in Telegram messages between the defendant JOSHUA NASS and the Confidential Witness, which I have reviewed, later on January 29, 2026, NASS told the Confidential Witness that NASS received "confirmation" that John Doe 2 was in Miami, Florida, but that John Doe 2 planned to travel to New York City that evening.   In a further text message, which I reviewed, NASS suggested that the Confidential Witness "mention" to John Doe 2 that the Confidential Witness knew John Doe 2 "was in Miami[,] as a way of showing you're keeping tabs."

---

4    The Confidential Witness had not gone to John Doe 2's residence.

12.     The defendant JOSHUA NASS and the Confidential Witness met in person again the following day, and they continued to discuss the scheme to extort John Doe 2, including the possibility of forcing John Doe 2 from his residence into a car and physically assaulting John Doe 2.   NASS indicated that that he was willing to give the Confidential Witness $5,000 to pay for any additional men that the Confidential Witness would bring with him in an effort to intimidate John Doe 2.   During the course of this meeting, a recording of which I have reviewed, NASS indicated that, if John Doe 2 rebuffed the attempt to pay, NASS did not want the Confidential Witness to behave "like a human being with" John Doe 2.

WHEREFORE, your deponent respectfully requests that an arrest warrant for the defendant JOSHUA NASS be issued so that he may be dealt with according to law.

JOHN-PATRICK RABENA
Special Agent
Federal Bureau of Investigation

Sworn to before me by telephone this
13th day of March, 2026

THE HONORABLE TARYN A. MERKL
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK