UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x
UNITED STATES OF AMERICA,

– against – No. 26-cr-108 (DLI)

JOSHUA NASS,

Defendant.
----------------------------------------------------------------------x

**DEFENDANT JOSHUA NASS' MEMORANDUM OF LAW IN SUPPORT OF HIS OMNIBUS PRETRIAL MOTIONS**

**MEISTER SEELIG & SCHUSTER PLLC**
***Counsel for Joshua Nass***
125 Park Avenue, 7th Floor
New York, New York 10017
Phone: (212) 655-3500
Fax: (212) 655-3535

## TABLE OF CONTENTS


I. INTRODUCTION ........................................................................................................ 1

II. THE INDICTMENT RUNS AFOUL OF SECOND CIRCUIT LAW, WARRANTING DISMISSAL UNDER FEDERAL RULE OF CRIMINAL PROCEDURE 12.................. 4

A. Legal Standard: Motion to Dismiss Under Rule 12................................................ 4

B. The Government Cannot Properly Charge Mr. Nass with Aiding and Abetting a Government Agent; the Indictment's Charges are Thus Improper......................... 5

C. Count Two Charging Use of Interstate Facilities to Commit Extortion Should Be Dismissed for Manufactured Federal Jurisdiction Via the Government Cooperator's Actions ........................................................................................ 8

D. This Court Should Dismiss the Federal Stalking Offenses at Counts Four and Five Because They Fail to State a Cause of Action and are Unconstitutional as Applied ........................................................................................................... 10

1. The Federal Stalking Statute at 18 U.S.C. § 2261A(1) and (2) ................ 11

2. The Stalking Statute Only Criminalizes Attempt Conduct as Part of its Third Element, the Causation Element, and Otherwise Requires Proof of Completed Acts of a Course of Conduct that is not Alleged in this Indictment; the Stalking Counts, Therefore, Must be Dismissed ............ 13

i. *Attempt Liability Must be Specified in the Federal Statute* ................ 14

ii. *Canons of Statutory Construction Require a Finding That Attempt Liability in the Stalking Statute is Confined to the Element of Causation* 15

3. Because Counts Four and Five Fail to Allege a Completed Course of Conduct Under the Act Element, They Fail as a Matter of Law and Should be Dismissed ............................................................................. 17

4. After the Second Circuit's Decision in Dennis, Only "True Threats" Are Punishable Under the Stalking Statute, But No "True Threats" Are Alleged in Counts Four and Five; these Counts Should Be Dismissed................. 19

5. The "Place Under Surveillance" Provisions in the Stalking Statute are Unconstitutionally Vague and Overbroad Under the First Amendment .. 22

6. The Surveillance Provision Violates the First Amendment as Facially Overbroad and As-Applied to this Case .................................................. 26

i. *Facial Challenge*..................................................................................... 26

ii. *As-Applied Challenge* ........................................................................... 29

III. THE COURT SHOULD ORDER THE GOVERNMENT TO PROVIDE A BILL OF PARTICULARS: THE BARE STATUTORY LANGUAGE OF THE INDICTMENT DOES NOT PROVIDE MR. NASS WITH REQUISITE NOTICE OF THE CONDUCT UNDERLYING THE NEW YORK STATE PENAL LAW VIOLATIONS IN COUNTS TWO, THREE, AND SIX ........ 30

A. Counts Two, Three and Six Charge Violations of New York Extortion Statutes With Broadly-Worded, and Disparate Elements ........ 33

1. NYPL § 135.60 - Coercion in the Third Degree, NYPL § 155.05(2)(e) - Larceny; Defined ........ 34

2. NYPL § 155.30 - Grand Larceny in the fourth degree, and NYPL § 155.40 - Grand larceny in the second degree ........ 37

B. A Bill of Particulars is Required to Facilitate Mr. Nass' Fundamental Right to a Fair Trial ........ 38

IV. PER RULE 16 AND *BRADY* MR. NASS SHOULD RECEIVE BASIC TECHNICAL AND CUSTODIAL INFORMATION REGARDING THE GOVERNMENT'S FAILED ATTEMPTS TO RECORD HIS CONVERSATIONS WITH THE COOPERATING WITNESS ON JANUARY 13, 2026 AND JANUARY 29, 2026 ........ 41

V. CONCLUSION ........ 45

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*ACLU v. Alvarez*,
679 F.3d 583 (7th Cir. 2012) .......... 27

*Ashcroft v. Free Speech Coalition*,
535 U.S. 234 (2002) .......... 27

*Bery v. City of New York*,
97 F.3d 689 (2d Cir. 1996) .......... 27

*Brady v. Maryland*,
373 U.S. 83, (1963) .......... 44

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973) .......... 26, 27

*City of Seattle v. Ivan*,
71 Wash. App. 145 (1993) .......... 34

*Counterman v. Colorado*,
600 U.S. 66 (2023) .......... 13, 20, 21

*DiSimone v. Phillips*,
461 F.3d 181 (2d Cir. 2006) .......... 45

*Dowling v. United States*,
473 U.S. 207 (1985) .......... 4

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012) .......... 22

*Fields v. City of Phila.*,
862 F.3d 353 (3d Cir. 2017) .......... 27

*Hamling v. United States*,
418 U.S. 87 (1974) .......... 18

*Johnson v. United States*,
576 U.S. 591 (2015) .......... 22, 23

*Kolender v. Lawson*,
461 U.S. 352 (1983) .......... 25

*Mahanoy Area School Distr. v. B.L.*,
594 U.S. 180 (2021) .......... 26

*Market Co. v. Hoffman*,
101 U.S. 112 (1879) .......... 15

*Percoco v. United States*,
598 U.S. 319 (2023) .......... 23

*Richards v. United States*,
369 U.S. 1 (1962) .......... 16

*Roarck & Hardee LP v. City of Austin*,
522 F.3d 533 (5th Cir. 2008) .......... 22

*Rosemond v. United States*,
572 U.S. 65 (2014) .......... 5

*Sessions v. Dimaya*,
138 S. Ct. 1204 (2018) .......... 22

*Skilling v. United States*,
561 U.S. 358 (2010) .......... 23, 24

*Snyder v. Phelps*,
562 U.S. 443 (2011) .......... 28

*State v. Jorgenson*,
946 N.W.2d 596 (Minn. 2020) .......... 34

*State v. Robertson*,
293 Or. 402 (1982) .......... 35

*State v. Weinstein*,
182 Ariz. 564 (Ct. App. 1995) .......... 34

*United States v. Alexander*,
No. 24-CR-676 (VEC), 2025 WL 3154981 (S.D.N.Y. Nov. 11, 2025) .......... 9, 10

*United States v. Aleynikov*,
676 F.3d 71 (2d Cir. 2012) .......... 4, 5, 7

*United States v. Archer*,
486 F.2d 670 (2d Cir. 1973) .......... 8, 9, 10

*United States v. Barnes*,
604 F.2d 121 (2d Cir.1979) ........................................ 6

*United States v. Bonanno Organized Crime Family of La Cosa Nostra*,
879 F.2d 20 (2d Cir. 1989) ........................................ 16

*United States v. Bortnovsky*,
820 F.2d 572 (2d Cir. 1987) ........................................ 30, 31, 39

*United States v. Cabrera*,
No. 17-CR-202-EAW-MJR, 2018 WL 4328027 (W.D.N.Y. Aug. 8, 2018)........................................ 44

*United States v. Castillo*,
36 F.4th 431 (2d Cir. 2022) ........................................ 17

*United States v. Chin*,
934 F.2d 393 (2d Cir. 1991) ........................................ 9

*United States v. Covington*,
395 U.S. 57 (1969) ........................................ 4

*United States v. Crowley*,
236 F.3d 104 (2d Cir. 2000) ........................................ 4

*United States v. Dauray*,
215 F.3d 257 (2d Cir. 2000) ........................................ 15

*United States v. Davidoff*,
845 F.2d 1151 (2d Cir. 1988) ........................................ 40

*United States v. Davis*,
139 S. Ct. 2319 (2019)........................................ 23

*United States v. Dennis*,
132 F.4th 214 (2d Cir. 2025) ........................................ 11, 12, 13, 19, 20, 21, 22, 25, 27, 28, 30

*United States v. Farhane*,
634 F.3d 127 (2d Cir. 2011) ........................................ 14

*United States v. Fleury*,
20 F.4th 1353 (11th Cir. 2021)........................................ 20

*United States v. Gatto*,
746 F. Supp. 432 (D.N.J. 1990)........................................ 7

*United States v. Gullett*,
713 F.2d 1203 (6th Cir. 1983) .......... 40

*United States v. Heicklen*,
858 F. Supp. 2d 256 (S.D.N.Y. 2012) .......... 5, 7

*United States v. Helbrans*,
547 F. Supp. 3d 409 (S.D.N.Y. 2021) .......... 14, 18, 30

*United States v. Jordan*,
927 F.2d 53 (2d Cir. 1991) .......... 6, 7

*United States v. Kerik*,
615 F. Supp. 2d 256 (S.D.N.Y. 2009) .......... 5

*United States v. LaPorta,*
46 F.3d 152 (2d Cir. 1994) .......... 10

*United States v. Mangione*,
818 F. Supp. 3d 509 (S.D.N.Y. 2026) .......... 12

*United States v. Murphy*,
No. 20-CR-49-RJA-MJR, 2022 WL 19003378 (W.D.N.Y. Sept. 23, 2022) .......... 44

*United States v. Pacheco*,
225 F.3d 148 (2d Cir. 2000) .......... 15

*United States v. Perry*,
30 F.Supp.3d 514 (E.D. Va. 2014) .......... 39

*United States v. Pirro*,
212 F.3d 86 (2d Cir. 2000) .......... 5, 7, 19

*United States v. Resendiz-Ponce*,
549 U.S. 102 (2007) .......... 18

*United States v. Rittweger*,
524 F.3d 171 (2d Cir. 2008) .......... 45

*United States v. Rodriguez*,
496 F.3d 221 (2d Cir. 2007) .......... 45

*United States v. Scully*,
108 F. Supp. 3d 59 (E.D.N.Y. 2015) .......... 40

*United States v. Silver*,
864 F.3d 102 (2d Cir. 2017) ........ 23

*United States v. Sryniawski*,
48 F.4th 583 (8th Cir. 2022) ........ 20, 28

*United States v. Stevens*,
559 U.S. 460 (2010) ........ 26

*United States v. Stringer*,
730 F.3d 120 (2d Cir. 2013) ........ 39

*United States v. Torres*,
901 F.2d 205 (2d Cir. 1990) ........ 39

*United States v. Vasquez-Ruiz*,
136 F. Supp. 2d 941 (N.D. Ill. 2001) ........ 39

*United States v. Wallace*,
85 F.3d 1063 (2d Cir. 1996) ........ 10

*United States v. Wey*,
No. 15-CR-611 (AJN), 2017 WL 237651 (S.D.N.Y. Jan. 18, 2017) ........ 41

*United States v. Williams*,
553 U.S. 285 (2008) ........ 28

*United States v. Yuan Zhong Zhao*,
No. 18-CR-211 (LJV) (JJM), 2019 WL 7630633 (W.D.N.Y. June 12, 2019) ........ 41

*United States v. Yung*,
37 F.4th 70 (3d Cir. 2022) ........ 12, 19

*Virginia v. Black*,
538 U.S. 343 (2003) ........ 20

**Statutes**

18 U.S.C § 2 ........ 5, 6, 31

18 U.S.C. § 1346 ........ 24

18 U.S.C. § 1951(a) ........ 31

18 U.S.C. § 1952(a)(3)(A) ........ 8, 31

18 U.S.C. § 2261A ............ 10, 11, 12, 13, 14, 16, 17, 18, 20, 22, 27, 28, 29

18 U.S.C. § 2266 ............ 12, 13, 21, 30

18 U.S.C. § 3500 ............ 45

A.R.S. § 13–1804(A)(6) ............ 34

NYPL § 20.00 ............ 31

NYPL § 135.60 ............ 3, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40

NYPL § 144.30 ............ 32

NYPL § 155.05 ............ 3, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40

NYPL § 155.30 ............ 3, 31, 33, 37, 38, 39, 40

NYPL § 155.40 ............ 3, 31, 32, 33, 37, 38, 39, 40

**Rules**

Fed. R. Crim. P. 7 ............ 4, 30, 31, 33

Fed. R. Crim. P. 12(b) ............ 4, 41

Fed. R. Crim. P. 16(a)(1) ............ 8, 44

We respectfully submit defendant Joshua Nass' memorandum of law in support of his omnibus pretrial motions requesting that the Court: (1) dismiss the Indictment's charges as legally insufficient; (2) order the government to file a bill of particulars with respect to Counts Two, Three, and Six; and (3) order the government to provide limited and specific additional discovery regarding its apparent failed efforts to record conversations between its cooperating witness and Mr. Nass on January 13, 2026 and January 29, 2026.

## I. INTRODUCTION

Joshua Nass is scheduled to begin trial on the six Count Indictment on August 10, 2026. And he looks forward to that date. He looks forward to the opportunity to vindicate his innocence to these charges. He looks forward to clearing his name, presently clouded by the government's contention that he attempted to aid and abet Hobbs Act extortion. According to the government, Mr. Nass hired an individual who was already signed up as a government cooperating witness (an agent of the government) with whom he communicated about the alleged victims. No one—neither Mr. Nass, nor the government's cooperating witness, nor anyone else—ever threatened the alleged victims. To the contrary, they never even communicated with the alleged victims, and they certainly did not actually seek to harm the alleged victims. Nothing actually happened beyond a government cooperating agent engaging Mr. Nass in conversation, recording some of those conversations, and unsuccessfully trying to record several additional conversations with Mr. Nass. No one was hurt. No alleged victim was ever contacted by cellular telephone, in person, or by any other means.

The government's theory is wrong as a matter of fact, and does not support the charges in the Indictment as a matter of law. At trial, Mr. Nass will demonstrate that he and the alleged victim John Doe 1 entered into a valid contract pursuant to which Mr. Nass would assist John Doe 1 in his effort to obtain clemency and early release from prison. John Doe 1 had been convicted of

federal and state crimes and was set to serve a custodial sentence in Arkansas state prison. Pursuant to the contract, John Doe 1 owed Mr. Nass a retainer for him to commence working on release from state prison. Ultimately, John Doe 1 was released from Arkansas State Prison shortly thereafter, and long before his state sentence was complete. Mr. Nass had also already assisted with John Doe 1's federal pardon, but without any additional compensation.

But there was a problem: John Doe 1, and his family members who assisted with family finances did not abide by the terms of the contract, leaving Mr. Nass unpaid. Mr. Nass thus sought the services of an individual who performed private investigation and debt collection work—to his misfortune, that individual was a government cooperating witness who used his interactions with Mr. Nass a means to advance his own cooperation efforts with the government. The cooperating witness proceeded to suggest committing violent acts to collect the money contractually owed Mr. Nass. He endeavored to cajole Mr. Nass into consenting to the government cooperating witness' supposed plot. In the process he recorded two meetings with Mr. Nass, and apparently sought, but failed, to record several more conversations between them.

The government's theory glosses over all of that—but that is a factual issue that Mr. Nass will wait to amply address before the jury. We may not get there, however. The Indictment's charges are fundamentally flawed, requiring Court intervention and dismissal at this stage. The government charges each Count in the Indictment as Mr. Nass' aiding and abetting. But because the government agent is the only other person allegedly involved in the inchoate extortion plot, the government necessarily alleges that Mr. Nass aided and abetted the government agent. That, however, is anathema to established law that a defendant cannot aid and abet a government agent in purported criminality, just as a defendant cannot conspire with a government agent. That is fatal to the charge of aiding and abetting attempted Hobbs Act extortion in Count One, and to all

of the Indictment's other charges in Counts Two through Six that uniformly rely on an aiding and abetting theory.

There are other problems with the Indictment too. Counts Four and Five, charging Insterstate Stalking and Cyberstalking—which like all of the other charges are no more than inchoate attempt crimes—do not meet the bare elements of the statute. Because the Stalking statutes implicate First Amendment concerns, they are narrowly drawn to reach only speech and conduct that is not constitutionally protected. The statutes, therefore, require two actual acts or communications directed at the alleged victims; the only attempt contemplated by the statues is an attempt to cause emotional distress. In other words, a defendant can violate the stalking statutes by making concrete threats and communications to the alleged victims, which attempted to cause emotional distress, whether or not the communications actually caused the emotional distress. But that is not what happened here. As conceded by the government's charging documents, no one—not Mr. Nass, not the government cooperator, and not anyone else—actually made any threats or communications at all with the alleged victims. An attempted, or contemplated communication to an alleged victim is simply not covered by the Stalking statutes. That is black letter law that the Indictment violates, warranting dismissal of the Stalking Counts Four and Five.

Perhaps there are other fundamental problems with the elements charged in the Indictment, but for some of the Counts Mr. Nass simply does not know. Counts Two, Three and Six, charging Travel Act violations incorporate generally worded New York Penal Law extortion and larceny statutes, which purport to criminalize broad swaths of conduct. For example, they include stealing, threats of exposing a secret, threats of orchestrating criminal liability, and other harmful or criminal acts. *See* NYPL §§ 135.60, 155.30(6), 155.40(2), 155.05(2)(e). But what conduct did the grand jury charge in those counts? Beyond allegations of conversations with the government

cooperating witness in which alleged physical harm is raised and charged as attempted aiding and abetting Hobbs Act extortion, there are no allegations of theft or other threats in either the Indictment, or the more detailed Criminal Complaint. And the discovery is similarly barren of facts suggesting the government's theory. Federal Rule of Criminal Procedure 7 requires that a defendant have "notice" of the conduct for which he faces criminal liability, jeopardizing his liberty. Mr. Nass does not have that. He cannot prepare for trial on these charges. Mr. Nass relishes the opportunity for a speedy trial, but to ensure his trial is fair as well, the government should be required to provide a bill of particulars outlining the basic facts that Mr. Nass will face.

## II. THE INDICTMENT RUNS AFOUL OF SECOND CIRCUIT LAW, WARRANTING DISMISSAL UNDER FEDERAL RULE OF CRIMINAL PROCEDURE 12

### A. Legal Standard: Motion to Dismiss Under Rule 12

Federal Rule of Criminal Procedure 12(b)(1) provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the issue." Fed. R. Crim. P. 12(b); *see also United States v. Covington*, 395 U.S. 57, 60–61 (1969) (holding that where determinative questions of law were decided in his favor, defendant was entitled to dismissal of indictment).

Because federal crimes are "solely creatures of statute," *Dowling v. United States*, 473 U.S. 207, 213 (1985) (quotations omitted), "a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute." *United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012). "[A] claim that an indictment does not charge an offense may be raised at any time, and may be considered by a court *sea sponte*." *United States v. Crowley*, 236 F.3d 104, 108 n.6 (2d Cir. 2000).

Where, as here, the government has set out detailed factual allegations in its charging documents, the Court must dismiss the Indictment if those allegations, taken as if true, do not

establish criminal liability. *See, e.g., Aleynikov*, 676 F.3d at 76–79 (dismissing indictment as transferring proprietary computer source code alleged in indictment, did not constitute offense under National Stolen Property Act); *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000) (dismissing tax fraud and perjury counts because conduct alleged in indictment did not violate applicable statute); *United States v. Heicklen*, 858 F. Supp. 2d 256, 275-76 (S.D.N.Y. 2012) (dismissing indictment where facts alleged did not constitute the crime of attempting to influence the actions of a juror); *United States v. Kerik*, 615 F. Supp. 2d 256, 271-74 (S.D.N.Y. 2009) (dismissing false statement charge because defendant's alleged failure to disclose information in response to a question that the court determined was "fundamentally ambiguous" was not a crime as a matter of law).

### B. The Government Cannot Properly Charge Mr. Nass with Aiding and Abetting a Government Agent; the Indictment's Charges are Thus Improper

In all six counts of the Indictment, the government charged Mr. Nass under 18 U.S.C § 2. During a June 16, 2026 meet and confer in advance of filing these pretrial motions, the government represented that its theory in this case against Mr. Nass is predicated on aiding and abetting liability. Of course, if the government believes that Mr. Nass aided and abetted someone, the question is who? The Criminal Complaint is clear that there were only two people allegedly involved in the Indictment's charges—Mr. Nass and the government cooperating confidential witness. *See* Crim. Compl., ECF Doc. 1, ¶¶ 3-12. The Indictment neither alleges nor suggests anything to the contrary.

To be guilty of aiding and abetting under 18 U.S.C § 2(a), a defendant must aid or abet a "principal" in the commission of a crime. *See* 18 U.S.C § 2(a) ("Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."); *see also Rosemond v. United States*, 572 U.S. 65, 70 (2014) (18

U.S.C § 2 "derives from (though simplifies) common-law standards for ***accomplice*** liability. And in so doing, § 2 reflects a centuries-old view of culpability: that a person may be responsible for a crime he has not personally carried out if he ***helps another*** to complete its commission.") (emphasis added; quotation marks and citations omitted).

But for accomplice liability to attach, the "principal" who the defendant allegedly aids and abets cannot be a government agent. *See, e.g. United States v. Jordan*, 927 F.2d 53, 55 (2d Cir. 1991) (in drug prosecution based on aiding and abetting liability, "Because the person who physically carried the heroin from Thailand to New York was a Government agent, the prosecution did not contend that he was the principal, for purposes of the substantive importation offense."). In this regard, aiding and abetting liability is analogous to conspiracy liability: just as criminal liability cannot attach for "conspiring" with a government agent, so too there can be no criminal aiding and abetting when the principal actor is a government agent. *See, e.g., United States v. Barnes,* 604 F.2d 121, 161 (2d Cir.1979) ("In order to be guilty of conspiracy . . . the individual charged must have conspired with someone other than a government agent or an informant.").

Nonetheless, that is, apparently, precisely the government's theory here. All six counts of the Indictment cite to 18 U.S.C. § 2. *See* Indict.¶¶ 1-6. And, the government confirmed during a June 16, 2026 meet and confer that its theory of criminal liability against Mr. Nass is rooted in aiding and abetting. That makes little sense. As the factual allegations in the Criminal Complaint clarify, the core conduct charged is alleged attempted extortion of John Doe-1, John Doe-2, and Jane Doe. Crim. Compl., ECF Doc. 1, ¶¶ 3-12. The critical alleged conduct underlying the Indictment's is centered on three meetings on January 8, 2026, January 29, 2026, and January 30, 2026—at which only Mr. Nass and the government's confidential cooperating witness were

present. *See* Crim. Compl. ¶¶ 5, 9-10, 12. There was no one else there.[1] The other relevant communications underlying the alleged attempted extortion were similarly solely between Mr. Nass and the government's confidential cooperating witness. *See id.* ¶¶ 4, 7-8, 11.

Thus, taking as true the facts outlined in the government's charging documents—as required for purposes of a dismissal motion under Rule 12—the government's cooperating witness was the only person who Mr. Nass could have allegedly aided and abetted in the crimes charged in the Indictment. The cooperating witness, a government agent, was the only other person allegedly involved. *See id.* ¶¶ 4-12.

Because, as a legal matter, a defendant cannot be held criminally liable for aiding and abetting a government agent, to the extent the Indictment's charges rest on a theory of aiding and abetting liability, they must fail.[2] *See Jordan*, 927 F.2d at 55. Dismissal of the Indictment is thus warranted for failing to state legally cognizable charges against Mr. Nass. *See, e.g., Aleynikov*, 676 F.3d at 76–79; *Pirro*, 212 F.3d at 92; *Heicklen*, 858 F. Supp. 2d at 275-76.

---

[1] Importantly, none of the alleged victims were present during the meetings. And, there are no allegations that Mr. Nass, the government's cooperating witness, or anyone else, actually contacted, threated, intimidated, or behaved violently in any way towards the victims.

[2] To the extent that the government's theory in the Indictment relies on alleged aiding and abetting a different principal—not the government's cooperating witness—the government should disclose as much now, to ensure that Mr. Nass can adequately prepare for trial, and is apprised of the basic facts the government intends to present against him. *See, e.g., United States v. Gatto*, 746 F. Supp. 432, 477 (D.N.J. 1990) ("To the extent the indictment alleges that 'others' were involved, the government must specify the who the 'others' are."), *rev'd on other grounds*, 924 F.2d 491 (3d Cir. 1991). The same should be required if, contrary to the government's statements during the June 16, 2026 meet and confer with defense counsel, the charges do not rest on an aiding and abetting theory.

### C. Count Two Charging Use of Interstate Facilities to Commit Extortion Should Be Dismissed for Manufactured Federal Jurisdiction Via the Government Cooperator's Actions

The Indictment's failings are particularly stark in Count Two, charging Use of Interstate Facilities to Commit Extortion. *See* Indict. ¶ 2. Count Two charges using "one or more cellular telephones, with intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of unlawful activity," under to 18 U.S.C. § 1952(a)(3)(A). *Id.* As clarified by the allegations in the Criminal Complaint—which are consistent with the discovery the government has produced pursuant to Rule 16—all cellular communications involved with the allegations were with the government agent. *See* Crim. Compl. ¶¶ 7-8 (discussing cellular communications between Mr. Nass and the government cooperating witness on January 8 and January 13). In other words, the government cooperating witness engaged in cellular communications with Mr. Nass in order to entice him into the very conduct that the government now seeks to prosecute.[3] That cannot be the basis of a Travel Act violation, undermining the legality of Count Two in its totality.

Over decades, the Second Circuit has questioned the legitimacy of similar Travel Act violations predicated on telephone communications prompted by a government agent. In *United*

[3] Notably, those are among the conversations that the government apparently hoped the cooperating witness would record for use as evidence on January 13, 2026. Somehow, either through mechanical error, human error, or human volition, the cooperating witness failed to record several calls and an in person meeting. Mr. Nass is entitled to additional discovery about what exactly happened that prevented those recordings, and why, to ensure that he can adequately prepare his defense. Because the recordings, and the cooperating witness' testimony about the conduct of the alleged meetings are central to the government's case, challenging that evidence, and presenting to the jury facts about why the government cooperator could not—or did not—record those meetings is similarly central to Mr. Nass' trial defense. Rule 16 thus requires the government to produce the technical information regarding the recordings, as well as their chain of custody, download process, and any other factual documentation in the government's possession documenting the recording or download process relevant to the cooperating witness' conversations with Mr. Nass. *See* Fed. R. Crim. P. 16(a)(1)(E), (F); *see also infra* § IV.

*States v. Archer*, 486 F.2d 670 (2d Cir. 1973), the Second Circuit dismissed an indictment charging travel act violations "where the sole 'federal' elements were telephone calls from or to an undercover agent." *Archer*, 486 F.2d at 684. The Second Circuit was emphatic that in enacting the Travel Act, "Congress certainly did not intend to include a telephone call manufactured by the Government for the precise purpose of . . . fabricat[ing]" the predicates for a federal crime"—in other words, the government could not orchestrate calls with government agents whose conduct was a linchpin of the conduct charged, and then charge that very conduct as a federal crime. *Id*. at 681; *id.* at 682 (the Travel Act "did not mean to include cases where the federal officers themselves supplied the interstate element and acted to ensure that an interstate element would be present."); *accord United States v. Chin*, 934 F.2d 393, 400–01 (2d Cir. 1991) ("caution[ing] law enforcement agents to think twice before engaging in investigative techniques that encourage individuals to commit actions that harm innocent third parties. . . prosecutors and their agents naturally tend to assign great weight to the societal interest in apprehending and convicting criminals; the danger is that they will assign too little to the rights of citizens to be free from government-induced criminality.") (quotations marks and citations omitted).

Of course, that is in line with broader notions of Due Process—there is something inherently perverse about coaxing a person to commit a crime, and then charging them with an attempt to commit the crime based solely on their conversations with a government agent. But that is precisely what happened here. The government's cooperator made threatening statements about potential violence to the alleged victims, and subsequently engaged Mr. Nass in cellular communications. The sole conduct underlying the Travel Act violation charged in Count Two was thus manufactured by the government agent, exactly what the Second Circuit has denigrated as improper. *See e.g., United States v. Alexander*, No. 24-CR-676 (VEC), 2025 WL 3154981, at *13

(S.D.N.Y. Nov. 11, 2025) ("federal jurisdiction cannot be created by luring defendant into making an interstate call") (citing *United States v. Archer*, 486 F.2d 670, 677–78, 683–86 (2d Cir. 1973)); *see also United States v. Wallace*, 85 F.3d 1063, 1065–66 (2d Cir. 1996) (dismissal for "manufactured jurisdiction," as with the cellular communications here "is properly understood . . . as a subset of three possible defense theories: (i) the defendant was entrapped into committing a federal crime, since he was not predisposed to commit the crime in the way necessary for the crime to qualify as a federal offense; (ii) the defendant's due process rights were violated because the government's actions in inducing the defendant to commit the federal crime were outrageous, *see LaPorta,* 46 F.3d at 160; or (iii) an element of the federal statute has not been proved, so federal courts have no jurisdiction over the crime"). The Court should thus dismiss Count Two.

**D. This Court Should Dismiss the Federal Stalking Offenses at Counts Four and Five Because They Fail to State a Cause of Action and are Unconstitutional as Applied**

This Court should dismiss Counts Four and Five of the Indictment as a statutory and constitutional overreach by the government.

First, for reasons stated throughout these motions, the government's theory of the Indictment must, as a matter of law, be charged as an attempt crime. The entire investigation was a "sting" operation, so it could never have resulted in an actual substantive crime. As an attempt-crime allegation, the Indictment must fail in its two stalking counts because the government ignores fundamental notions of statutory construction. The statute at 18 U.S.C. § 2261A(a) and (b) provides only for attempt liability in its "causation" element and ***not*** in the "course of conduct" element. Because the Indictment does not allege a "course of conduct" element sufficient to satisfy the statute's express requirement, it must fail.

Second, the stalking counts must fail because they rely on statutory language that is constitutionally vague and fails to give Mr. Nass, or any reasonable person, sufficient notice of the

alleged conduct it seeks to criminalize. Specifically, the Indictment alleges, in part, in Counts Four and Five, that Mr. Nass engaged in a willful course of conduct through the use of electronic communications to "place under surveillance" with an intent to harass and intimidate, three alleged victims, which attempted to cause these individuals substantial emotional distress. The "place under surveillance" conduct charged in the statute is unconstitutionally vague and therefore voids this part of the charged offense.

Third, the stalking charges must be dismissed because they violate the First Amendment as-applied in this case. Count Four does not allege "true threats" to the charged victims as required by the Second Circuit's decision in *United States v. Dennis,* 132 F.4th 214 (2d Cir. 2025). In *Dennis,* the Second Circuit ruled that to prevent the cyberstalking statute from running afoul of the First Amendment, the course of conduct alleged to "harass" and "intimidate" must be limited to "true threats" of bodily harm made to the alleged victims themselves. This Indictment does not include any specific allegations of "true threats" made to the charged victims and, therefore, Counts Four and Five must be dismissed on this alternative ground.

**1. *The Federal Stalking Statute at 18 U.S.C. § 2261A(1) and (2)***

In Counts Four and Five, the Indictment charges Mr. Nass with two attempted crimes of interstate stalking. Both offenses are defined in Section 2261A of the criminal code, which provide in relevant part as charged in the Indictment:

> Whoever –
>
> (1) Travels in interstate or foreign commerce . . . with the intent to . . . harass, intimidate, or place under surveillance with intent to . . . harass, or intimidate another person, and in the course of, or as a result of, such travel or presence engages in conduct that –
>
> (B) causes, ***attempts to cause***, or would be reasonably expected to cause substantial emotional distress to a person described in clauses (i), (ii), or (iii) of subparagraph (A) [which

> includes "that person," "an immediate family member" of that person, or "the spouse" of that person]; or
>
> (2) With the intent to . . . harass, or intimidate another person, or place under surveillance with intent to . . . harass, or intimidate another person . . . uses . . . any interactive computer serves or electronic communication service or electronic communication system of interstate commerce . . . to engage in a course of conduct that –
>
> (B) causes, or ***attempts to cause***, or would be reasonably expected to cause substantial emotional distress to a person in clause (i), (ii), or (iii) of paragraph (1)(A),
>
> shall be punished as provided in Section 2261(b) . . .

18 U.S.C. § 2261A (emphasis added).

For relevant purposes here, "course of conduct" is defined at 18 U.S.C. § 2266, as "a pattern of conduct composed of 2 or more acts, evidencing a continuity of purpose." 18 U.S.C. § 2266.

Subsections (1) and (2) of Section 2261 each provides an alternative basis for federal jurisdiction: subsection (1) criminalizes stalking through interstate travel (charged in Count Five) ("Travel Stalking") and subsection (2) criminalizes stalking through any electronic communication system of interstate commerce (such as the internet or texting) (charged in Count Four) ("Cyberstalking"). Aside from the jurisdictional threshold, subsections (1) and (2) are largely the same. *See United States v. Mangione*, 818 F. Supp. 3d 509, 522-23 (S.D.N.Y. 2026) (analyzing the elements of the two subsections of Section 2261A).

The statute in both subsections requires three elements: (1) a course of conduct; (2) an intent to harm; and (3) an intent to cause a certain specified result. *See United States v. Dennis,* 132 F.4th 214, 224 (2d Cir. 2025) (identifying three elements of act, intent and result); *United States v. Yung*, 37 F.4th 70, 76 (3d Cir. 2022) (same).

The first element, termed the Act Element, requires a "course of conduct," including either interstate travel or the use of electronic communications (depending on the subsection charged)

consisting "of 2 or more acts, evidencing a continuity of purpose." 18 U.S.C. § 2261A(1) and (2), and 2266.

The second element, termed the Intent Element, requires that the course of conduct be undertaken with a certain malicious intent toward another person. In this case, the specific intent alleged was to "harass and intimidate" three individuals. Indict., Counts Four and Five.

The third element, termed the Result Element, requires that a defendant engage in this conduct to cause or attempt to cause a certain result. In this Indictment, the charges are attempts. The Result Element charged here is "attempting to cause and would be reasonably expected to cause substantial emotional distress" to the same three individuals. (Indict., Counts Four and Five).

### ***2. The Stalking Statute Only Criminalizes Attempt Conduct as Part of its Third Element, the Causation Element, and Otherwise Requires Proof of Completed Acts of a Course of Conduct that is not Alleged in this Indictment; the Stalking Counts, Therefore, Must be Dismissed***

The federal stalking statute is broadly written and necessarily invokes protected speech concerns that have driven courts already to narrow its reach to avoid constitutional defects. *See Counterman v. Colorado,* 600 U.S. 66, 72 (2023) (narrowing Colorado stalking statute to "true threats of violence," which "everyone agrees, lie outside the bounds of the First Amendment"); *Dennis,* 132 F.4th at 228-29 (narrowing statute to course of conduct communicating "true threats" of bodily harm to avoid First Amendment violations). The federal stalking statute is further complicated by requiring a "course of conduct," which is defined as "a pattern of conduct composed of 2 or more acts, evidencing a continuity of purpose." 18 U.S.C. § 2266. This makes the proof required to find the *actus reas* more substantial. It also makes the inchoate crime of attempt in this context harder to interpret within the context of federal attempt case law. This may be the reason that Congress did not authorize an attempt element in the *actus reas* of the crime, and confined attempt liability only to the causation element of the statute.

In any event, there is no need to divine Congressional reasoning because the statute is unquestionably clear that attempt liability is limited to the Result Element, and not to the other elements, *i.e.,* the Act and Intent Elements. Thus, because attempt liability does not extend to the *actus reas*, or Act Element, of the statute, any cause of action under this statute must allege proof of a completed course of conduct sufficient to make out this element. In other words, the stalking act must have been completed, while causing the harm of substantial emotional distress—and only that element—may still be an attempt. The statute does not criminalize an attempted course of conduct in either the Travel Stalking or Cyberstalking subsections, which would, in any event, be an incoherent theory given the statute's definitions. Because Counts Four and Five of this Indictment do not allege or identify a completed course of conduct in the Act Element of the statute, they fail to state a cause of action and these Counts must be dismissed.

i. *Attempt Liability Must be Specified in the Federal Statute*

Unlike many state penal codes, federal law does not feature a general attempt statute. "Because there is no generally applicable federal attempt statute, Congress proscribes attempt on a case-by-case basis by including an attempt provision (e.g., "or attempts to do so") within the specific federal offense at issue." *United States v. Helbrans*, 547 F. Supp. 3d 409, 430 (S.D.N.Y. 2021). And the term "attempt" has a settled meaning in federal law: "A conviction for attempt requires proof that a defendant (a) had the intent to commit the object crime and (b) engaged in conduct amounting to a substantial step towards its commission." *United States v. Farhane*, 634 F.3d 127, 145 (2d Cir. 2011).

In this case, the federal Stalking statute encompasses attempt liability only within the third element of the crime, the Result Element, and then only within a certain subsection of that element. *See* 18 U.S.C. §§ 2261A(1)(B) and 2261A(2)(B). This is significant because the statute must be

construed under its plain terms. *See United States v. Pacheco*, 225 F.3d 148, 156 (2d Cir. 2000) (statutory construction begins with the principle of "examining the plain meaning of the statute"). Notably, the Stalking statute does not include any attempt language in the opening sentence of subsection (1) or (2). It also contains no attempt language in subsections 2261A(1)(A) or 2261A(2)(A). The only time Congress extended attempt liability is within the specific alternative offense of "caus[ing] substantial emotional distress to a person" in subsections 2261A(1)(b) and 2261A(2)(B). Thus, on its plain reading, attempt or inchoate liability is confined to the element of causation in the Stalking statute, and limited further to the specified result of causing "substantial emotional distress."[4]

ii. *Canons of Statutory Construction Require a Finding That Attempt Liability in the Stalking Statute is Confined to the Element of Causation*

In determining whether the attempt crimes charged in Counts Four and Five include attempts to commit a course of conduct to cause substantial emotional distress to the three alleged victims, this Court should start by examining the plain meaning of the statute. *Pacheco*, 225 F.3d at 156. In doing so, the Court should endeavor to give effect to the plain meaning of each word in the statute and common grammatical construction. *See United States v. Dauray,* 215 F.3d 257, 260 (2d Cir. 2000) (when interpreting a statute's plain meaning, courts "consider the ordinary, common-sense meaning of the words"); *see also Market Co. v. Hoffman*, 101 U.S. 112, 115-16 (1879) ("[A] statute ought, upon the whole, to be so construed that, if it can be prevented, no

[4] In contrast, the "reasonable fear" Result Element located at subsections 2261A(1)(A) and 2261A(2)(A) does not extend attempt liability to causing "reasonable fear of the death of or serious bodily injury to a person." In these subsections, Congress required proof that the defendant ***actually caused*** such "reasonable fear."

clause, sentence, or word shall be superfluous, void, or insignificant") (internal quotation marks omitted)).

In addition to giving words their plain meaning, dictates of statutory construction require that courts consider the statutory structure "as a whole," and where within that structure certain words are found. The "whole act" rule of statutory construction exhorts us to read a section of a statute not "in isolation from the context of the whole Act," but to "look to the provisions of the whole law, and to its object and policy." *Richards v. United States,* 369 U.S. 1, 11 (1962) (internal quotation marks omitted). As the Second Circuit has stated, courts must "interpret [a] specific provision in a way that renders it consistent with the tenor and structure of the whole act or statutory scheme of which it is a part." *United States v. Bonanno Organized Crime Family of La Cosa Nostra,* 879 F.2d 20 (2d Cir. 1989) (citing 2A Sutherland Statutory Construction, § 46.05 (4th ed. 1984)).

A "whole act" reading in this case favors Mr. Nass's view of the statute. Congress only included "attempt" liability within a far sub-subsection of the Stalking statute. *See* 18 U.S.C. 2261A (1)(B) and 2261A(2)(B). It buried this liability as a specific modifier to "caus[ing] substantial emotional distress" with this last alternative to the Stalking crime. Thus, under any plain meaning of these words, and in context of the statutory scheme, the only time that Congress authorized liability for the inchoate offense of an attempt crime is for proof related to whether the facts show a ***certain result*** of the *actus reas* conduct, *i.e.,* whether the interstate travel or use of electronic communications conduct, caused or "attempt[ed] to cause" substantial emotional distress. This is the ***only*** place in the statute where a defendant's "attempt" is sufficient to make out an element of the crime.

And it makes sense that Congress required actual completion of the course of conduct in the Act Element of the Stalking statute. Because the statute itself requires multiple acts that "evidenc[e] a continuity of purpose" and "2 or more acts" as the basis of criminal liability, it would be difficult to ascertain what constitutes a "substantial step" if, for example, only one act or partial act was found to be committed. It could lead to incoherent or unjust results under the statute to conclude that one act is sufficient to find a substantial step for an attempt crime when there is no crime until at least two acts are committed. Since the "pattern" constitutes an essential element of the crime, it would be difficult to conclude that a "substantial step" can be found in the completion of one act without more. Congress very well could have considered these problems in deciding to authorize criminal liability for inchoate offenses only with respect to the question of whether the defendant's actions actually resulted in, or caused, the harm required by the statute. *See United States v. Castillo*, 36 F.4th 431, 437 (2d Cir. 2022) (in conducting categorical statutory analysis, finding that statute should be interpreted to avoid incoherent or unintelligible results).

As a matter of statutory construction, the plain reading of the Travel Stalking and Cyberstalking crimes leads to the undeniable conclusion that attempt liability is limited to the Result Element of the crime of causing "substantial emotional distress" to a victim and nothing else. 18 U.S.C. §§ 2261A(1)(B) and 2261A(2)(B).

### 3. *Because Counts Four and Five Fail to Allege a Completed Course of Conduct Under the Act Element, They Fail as a Matter of Law and Should be Dismissed*

Counts Four and Five of the Indictment shed no light as to what is factually alleged as part of the "course of conduct" in either the Travel Stalking or Cyberstalking offenses. Except for the date of January 2026 and travel from South Carolina to New York, there are no fact allegations in either count.

In evaluating a motion to dismiss, "[a]lthough the language of the statute may be used in the description of the offense, the description 'must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which with which he is charged.'" *Helbrans*, 547 F. Supp. 3d at 423-34 (quoting *Hamling v. United States*, 418 U.S. 87, 117-18 (1974)). Here, the Indictment merely tracks parts of the statutory language. There is nothing alleged therein fairly to inform Mr. Nass of the actual charge against which he must defend, or to avoid double jeopardy concerns in the future. *See United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007).

The problems with this bare-bones Indictment are heightened here as the crimes charged are inchoate attempt crimes. This adds another element and intent level. Moreover, because the Stalking statute limits the scope of attempt liability to the causation or Result Element, Mr. Nass and this Court are left with no information to determine if the elements of these two crimes—specifically, the Act Elements—are sufficiently pled.

The Stalking statute under both Travel Stalking and Cyberstalking require a course of conduct to charge a crime. No conduct is identified in Counts Four and Five. Because the criminal complaint in this case identified the offense as part of an undercover government "sting" operation, there never was a chance that a substantive crime could be committed. There are no communications identified in the Indictment, or in the government's discovery between Mr. Nass and the alleged victims, which could constitute "true threats," or conduct that attempted to cause "substantial emotional distress." 18 U.S.C. §§ 2261A(1)(B) and 2261A(2)(B). The allegations of "stalking" are nowhere to be found. This is perhaps because the government wrongly believed that attempts at a course of offending conduct could be sufficient under the statute. Per the above,

however, that is not how Congress drafted this statute. The only "attempt" liability authorized here is in the result stage of the conduct, not in the actual conduct itself.

Because the stalking crimes here are multi-layered, require continuing patterns of conduct, and limit attempt liability, an Indictment which alleged ***no facts*** of the core of criminality is hopelessly deficient. Counts Four and Five allege a single month of conduct—January 2026—and discovery shows a total of three meetings between the cooperating witness and Mr. Nass (one of which was not recorded because of unknown defects, which we now believe may be due to government errors and not equipment failure). These meetings between a witness acting as a government agent and Mr. Nass, and no contact with the alleged victims, could never become a substantive crime. The alleged victims never knew about these meetings, and there are no allegations that there were any communications during this period between Mr. Nass and the alleged victims. Thus, "stalking" cannot be alleged, let alone proven. Mr. Nass and this Court are left wondering what this crime could actually be. The fairness of these proceedings requires something more than mere wonder. The law also demands as much. *See United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000) (affirming dismissal of indictment because the lack of specification of how an important element could be met was necessary to the fairness of the proceedings). This Court should, therefore, dismiss Counts Four and Five.

#### 4. *After the Second Circuit's Decision in Dennis, Only "True Threats" Are Punishable Under the Stalking Statute, But No "True Threats" Are Alleged in Counts Four and Five; these Counts Should Be Dismissed*

In *Dennis,* the Second Circuit joined several other federal Circuits in recognizing that applying § 2261A(2)(B) to a course of conduct communicating "true threats" avoids any First Amendment concerns that might arise construing that statute's intent and causation requirements too broadly. *Dennis*, 132 F.4th at 228; *cf. United States v. Yung,* 37 F.4th at 80 (holding that facial

challenge to § 2261A(2)(B) fails when "harass" and "intimidate" are narrowly construed to mean "true threat or speech integral to crime"); *United States v. Sryniawski*, 48 F.4th 583, 587 (8th Cir. 2022) (if "harass" or "intimidate" are "construed in their broadest sense," that could "infringe om rights protected by the First Amendment" and narrowing statute to communications conveying a "true threat"); *United States v. Fleury,* 20 F.4th 1353, 1365 (11th Cir. 2021) (holding "§ 2261A(2)(B) – as applied to [defendant] – did not violate the First Amendment because his messages were true threats").

This narrowing of the Stalking statute's prohibited conduct was also necessitated by the Supreme Court's decision in *Counterman v. Colorado*, 600 U.S. at 74. In considering the constitutionality of a similar Colorado state stalking statute, the Supreme Court affirmed that "[t]rue threats," which fall outside the First Amendment's protection of speech "are 'serious expression[s]' conveying that a speaker means to 'commit an act of unlawful violence.'" *Id.* (quoting *Virginia v. Black*, 538 U.S. 343, 359 (2003)).

The "true threat" requirement, imposed in this Circuit by *Dennis*, specifically requires as the *actus reas* ***some direct communication with the victim*** attempting to cause fear of bodily harm, or what is reasonably expected to cause fear, not to some third person to whom the defendant contemplates harm to the victim. *Counterman,* 600 U.S. at 74 ("Generally, the 'existence' of a true threat does not depend on the mental state of a declarant, "but on 'what the statement conveys' ***to the person on the other end.***") (emphasis added). This conveyance to the alleged victim is necessary because the Stalking statute—at both the Travel Stalking and Cyberstalking subsections—requires a Result Element, *i.e.,* the "true threat" or "stalking" conduct must intentionally "cause[ ], attempt[ ] to cause, or would be reasonably expected to cause" fear of harm to the person or their immediate family or spouse. *See* 18 U.S.C. §§ 2261A(1)(B) and

2261A(2)(B). In other words, the criminalized conduct itself is the threat communicated to a person and the fear it instills, not the preparation to make a possible future threat, or contemplation of future threats. Indeed, this course of conduct—the conveyance of threats—must include at least two or more acts, showing "continuity of purpose." 18 U.S.C. § 2266.

Moreover, as stated above, Congress did not create attempt liability for a defendant who merely planned or prepared to make these threats; the Act Element must be completed, only the Result Element can be attempted. This limitation is also consistent with the First Amendment concerns in *Counterman* and *Dennis*. Merely contemplating threats or even complaining to third parties about the purported victims and wishing ill on them, without conveying "true threats" directed at the targeted victim, is likely protected speech, and certainly not a violation of the Stalking statute, which requires much more, *i.e.,* pattern of conduct (acts); specific intent; and causing the result of instilling fear. In all of the Cyberstalking cases cited above—*Dennis, Yung, Sryniawski,* and *Fleury*—the defendants were charged with ***making communications directly*** to the charged victim or had posted publicly on the internet, all of which was determined to be an attempt to cause fear or reasonably expected to cause fear in the person to whom the threats were made. ***There are no cases under the federal Cyberstalking statute that do not include factual allegations of communications conveyed to or directed at the charged victim***—until this one. Such a charge simply cannot stand.

In Counts Four and Five, the Indictment identifies no "true threats"—or any communications at all—conveyed to the alleged victims. There is nothing in the earlier filed

Criminal Complaint or anywhere else that specifies this conduct. Absent such allegations, after *Dennis*, the case for either Travel Stalking or Cyberstalking cannot stand.[5]

### 5. *The "Place Under Surveillance" Provisions in the Stalking Statute are Unconstitutionally Vague and Overbroad Under the First Amendment*

Each of the subsections of the Stalking statute, Travel Stalking and Cyberstalking, includes a provision that purportedly criminalizes conduct to "place under surveillance with intent to harass and intimidate" the alleged victims. Indict., ¶¶ 4, 5. This conduct is both unconstitutionally vague and overbroad under the First Amendment.

The surveillance provision in the Stalking statute fails to provide reasonable notice of what constitutes impermissible "surveillance" under this clause. Due process entitles parties to "fair notice of conduct that is forbidden." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 252 (2012). But the test for vagueness is "more stringent" where, as here, a statute "threatens to inhibit the exercise of" First Amendment rights." *Roarck & Hardee LP v. City of Austin,* 522 F.3d 533, 552 (5th Cir. 2008).

The Supreme Court has long held that if a statute fails to provide fair notice to a defendant of the conduct that is forbidden, that statute cannot stand:

> The prohibition of vagueness in criminal statutes . . . is an essential of due process, required by both ordinary notions of fair play and the settled rules of law. The void-for-vagueness doctrine, as we have called it, guarantees that ordinary people have fair notice of the conduct a statute proscribes.

---

[5] While the cases cited herein all refer to the Cyberstalking subsection, § 2261A(2)(B), the same analysis should apply to Travel Stalking. This subsection also includes a Result Element. Count Five charges that "in the course of, and as a result of, such travel, [the defendant] engage[d] in conduct" that attempted to cause, or was reasonably expected to cause, the fear of risk of bodily harm to the purported victim. The fear of bodily harm requirement is the narrowing interpretation in *Dennis* of conduct intended to "intimidate" and "harass." *See* Indict., Count Five and 18 U.S.C. § 2261A(1)(B). The lack of specific allegations of the defendant's "conduct" in Count Five, *i.e.,* the Act Element of communicating "true threats" to the intended victims, creates the same fatal deficiencies as Count Four.

*Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (quotation marks and citations omitted); *accord Johnson v. United States*, 576 U.S. 591, 595–96 (2015) ("The prohibition of vagueness in criminal statutes is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law, and a statute that flouts it violates the first essential of due process.") (quotation marks and citations omitted). Statutes that "provide[] no reliable way to determine which offenses qualify as crimes" are "thus . . . unconstitutionally vague," precluding their broad enforcement. *United States v. Davis*, 139 S. Ct. 2319, 2323-24 (2019) ("Vague laws . . . leave people with no sure way to know what consequences will attach to their conduct. When Congress passes a vague law, the role of courts under our Constitution is . . . to treat the law as a nullity and invite Congress to try again.").

The scope of criminal statutes "must be defined with . . . clarity . . . and should not be held to reach an ill-defined category of circumstances." *Percoco v. United States*, 598 U.S. 319, 328–29 (2023) (quotation marks and citations omitted) (narrowing the scope of federal fraud statutes, rejecting an interpretive "theory endorsed by the lower courts" that endowed the statutes with "uncertain breadth that raises the due process concerns underlying the vagueness doctrine."). Thus, even where "there is some conduct that clearly falls within the [statutory] provision's grasp," charges stretching the bounds of statutory language may nonetheless be unconstitutional under the vagueness doctrine. *Johnson v. United States*, 576 U.S. 591, 602 (2015) ("our holdings squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp.").

The Supreme Court's recent fraud jurisprudence provides a framework for determining when and whether statutes are unconstitutionally vague as applied to charged conduct. Per the Supreme Court's decision in *Skilling v. United States*, when a statute is consistently applied only

to a "core category" of conduct, "[r]eading the statute to proscribe a wider range of offensive conduct . . . would raise the due process concerns underlying the vagueness doctrine." *Skilling v. United States*, 561 U.S. 358, 405, 408 (2010); *accord United States v. Silver*, 864 F.3d 102, 117 (2d Cir. 2017) ("expansive interpretation of official act" under the federal bribery statute "would raise significant constitutional concerns," including "subjecting public officials to prosecution without fair notice due to the vagueness of the Government's definition") (quotation marks and citations omitted). In the context of an honest services fraud prosecution, *Skilling* held that because long-standing caselaw applied the honest serviced fraud statute, 18 U.S.C. § 1346, "dominantly and consistently . . . to bribery and kickback schemes," a conviction outside the scope of that conduct could not stand. *Skilling*, 561 U.S. at 405 (reversing conviction for honest services fraud based on private self-dealing). The same heuristic cabins other federal criminal statutes, including the federal Stalking statute, to the same extent.

Here, once again, the Indictment provides no guidance as to what Counts Four and Five specifically allege with respect to the conduct criminalized under the "plac[ing] under surveillance" clause of the Stalking statute. There are no factual allegations made in the Indictment about this provision.

The statute also provides no definition of what it means to "place under surveillance with intent to harass and intimidate." Indict.,¶¶ 4, 5. An ordinary person could not define "surveillance" in the context of this statute because there is no concise and single understanding of this vague term in general parlance. Dictionary definitions only muddy the picture further. Surveillance can involve "[c]lose observation or listening of a person or place in the hope of gathering evidence." *Surveillance*, Black's Law Dictionary (11th ed. 2019). Or it might broadly be the simple "act of observing or the condition of being observed." *Surveillance*, American Heritage Dictionary

(2022).[6] Either of these definitions could be construed to include protected speech under the First Amendment, including the taking of photography or videos to gather information for journalistic or other news-gathering uses, which in fact applies here, because the story of one of the alleged victims in the Indictment became front-page news in the New York Times when he received a Presidential pardon after being convicted of federal fraud felonies. *See* Kenneth P. Vogel, "Pardon Industry Offers Rich Offenders a Path to Trump," *New York Times* (Mar. 6, 2026).[7]

The fact that the statute charges "surveillance with intent to harass and intimidate" does not cure this ambiguity. As the Second Circuit in *Dennis* stated, "[t]he First Amendment . . . protects a variety of speech that is intended to trouble or annoy, or to make another timid or fearful." *Dennis,* 132 F.4th at 228 (internal citations omitted). Thus, even "surveillance" that is intended to "trouble or annoy" does not provide information to a defendant about what is actually prohibited by this statute. Much of this conduct is protected speech and cannot form conduct sufficient to criminalize.

This uncertainty threatens arbitrary and discriminatory law enforcement actions by vesting unfettered discretion in police or federal agents to determine when and how the statute applies to a defendant's activities. *See Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (noting that vagueness can vest indefinite discretion in law enforcement). Here, the government's failure to include any factual allegations about specifically what is alleged as "surveillance" conduct lends credence to fears of arbitrary enforcement. The government has not provided any road map or suggestion of what this conduct might have been or how this "surveillance" caused, or reasonably could have caused, the alleged victims to fear bodily harm as part of the required Result Element of the statute.

---

[6] Available at: https://www.ahdictionary.com/word-/search.html?q=surveillance.
[7] Available at: https://www.nytimes.com/2026/03/06/us/politics/schwartz-trump-pardon-industry.html.

We have grave concerns that Mr. Nass was targeted by law enforcement not because of any unstated "surveillance" conduct he is alleged to have undertaken, but, perhaps, because of his work to obtain clemency for John Doe 1. The very fear generated by fatally vague statutory terms has been realized in Mr. Nass's prosecution—a sting operation of a completely innocent person who was never pre-disposed of criminal behavior.

Because there is no clear definition of what "surveillance" means in the context of the federal Stalking statute, and an ordinary person of common intelligence must necessarily guess at what conduct this encompasses, and ordinary people actually can differ as to its meaning, this provision of the Stalking statute must be stricken as unconstitutionally vague. Counts Four and Five should be dismissed accordingly.

**6. *The Surveillance Provision Violates the First Amendment as Facially Overbroad and As-Applied to this Case***

Mr. Nass challenges the provision in both sections of the Stalking statute, which criminalizes conduct that "place[s a person] under surveillance" with the intent to "harass" and "intimidate." Indict., ¶¶ 4, 5. This identical provision in both subsections of the statute is both facially overbroad and as-applied to Mr. Nass.

i. *Facial Challenge*

Because a wide range of constitutionally protected activity easily falls within the broad wording of the "surveillance" conduct charged against Mr. Nass in Counts Four and Five, even "judged in relation to the statute's plainly legitimate sweep," it runs afoul of the overbreadth doctrine. *United States v. Stevens,* 559 U.S. 460, 473 (2010).

An overbreadth attack is directed facially at the statute, and does not depend on the defendant's alleged conduct. The Supreme Court has relaxed standing rules in First Amendment cases to stop overbroad laws from chilling free speech. *Broadrick v. Oklahoma*, 413 U.S. 601, 610

(1973). That is because, a Supreme Court has recognized, for the freedom of speech to thrive, it must have breathing room. *See Mahanoy Area School Distr. v. B.L.*, 594 U.S. 180 (2021); *Broadrick,* 413 U.S. at 611. The Constitution, therefore, "prohibits the Government from banning [even] unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 235 (2002).

The provision that Mr. Nass facially challenges here, specifically conduct to "place under surveillance with intent to . . . harass, intimidate," 18 U.S.C. §§ 2261A(1) and 2261A(2), has not been challenged before for facial overbreadth before. Other provisions of the Stalking statute have, but to no avail. *See Dennis,* 132 F.4th at 226-27 (collecting cases).

The "conduct" at issue in the "surveillance" provision of the statute can consist entirely of speech, and much of it is protected. "Surveillance" can include taking photographs or video of people in public spaces; taking videos of people's homes; watching people's movements from a sidewalk or street corner; and following people's movements in public. These are all examples of protected speech that is swept up in the "surveillance" provision of the Stalking statute.

Photographs are protected by the First Amendment. *See Bery v. City of New York,* 97 F.3d 689, 696 (2d Cir. 1996). The act of taking a photograph and video, though not necessarily a communicative action in and of itself, is a necessary prerequisite to the existence of a photograph. It follows that taking photographs is also protected by the First Amendment. *See Fields v. City of Phila.*, 862 F.3d 353, 358 (3d Cir. 2017) ("The First Amendment protects actual photos, videos, and recordings, and for this protection to have meaning the Amendment must also protect the act of creating that material.") (citation omitted); *ACLU v. Alvarez,* 679 F.3d 583, 595 (7th Cir. 2012) ("The act of making an audio or audiovisual recording is necessarily included within the First

Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording.").

The only limitation in Mr. Nass's Indictment alleging unlawful "surveillance" is that the "surveillance" was conducted with the intent to "harass" and "intimidate." Of course, for reasons cited in *Dennis*, this sweeps in a substantial amount of protected speech. The First Amendment "protects a variety of speech that is intended to trouble or annoy, or to make another timid or fearful." *Sryniawski,* 48 F.4th at 587 (collecting Supreme Court cases); *see e.g., Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (holding that First Amendment protects picketers displaying hateful signs at military funeral and observing that "speech cannot be restricted simply because it is upsetting or arouses contempt").

In *Dennis,* the Second Circuit narrowed the reach of offending communications under 18 U.S.C § 2261A(2)(B) to "true threats." *Dennis*, 132 F.4th at 228-29. This same interpretation to narrow the category of speech swept under the Stalking statute does not make sense in the context of "plac[ing a person] under surveillance" to harass and intimidate. The *Dennis* court ostensibly wrote out of the Stalking statute the broader intent to "harass" and "intimidate" provisions. Transposing this logic onto the "surveillance" provision, however, does not work. Construed in its broadest sense, placing a person under surveillance does not, and could not communicate a "true threat" of bodily harm. This limiting principle does not save the "surveillance" provision in any meaningful way. Surveillance, by its nature, can be done without any other communication than the observation or recording of an individual. It therefore cannot be saved by the measures taken in *Dennis.*

In short, the scope of protected speech that falls within the plain meaning of the "place under surveillance" clause of §§ 2261A(1) and 2261(A)(2) is "substantial," which is all that must

be established. *United States v. Williams*, 553 U.S. 285, 292 (2008). This specific statute provision therefore fails the overbreadth test as defined by the Supreme Court.

ii. *As-Applied Challenge*

Mr. Nass also challenges the "surveillance" provision as-applied to the conduct alleged against him in this Indictment. The required analysis, however, is not possible at this time. As stated repeatedly above, there are no factual allegations made in either Counts Four or Five. Mr. Nass is left to speculate about what conduct he is alleged to have undertaken to "place under surveillance" any of the alleged victims identified in the Indictment.

As also previously explained, Mr. Nass was the subject of a government "sting" operation. His only alleged conduct here was the interaction and communications he had with the cooperating witness. There are no allegations involving Mr. Nass' communications or conveyances to the alleged victims. In the absence of such charges, it is impossible to discern what conduct Mr. Nass is alleged to have conducted related to "surveillance" of the targeted persons.

Only in the Criminal Complaint is there a reference to Mr. Nass knowing the whereabouts of one of the alleged victims. Specifically, paragraph 11 of the Complaint states:

> As reflected in Telegram messages between the defendant JOSHUA NASS and the Confidential Witness . . . later on January 29, 2026, NASS told the Confidential Witness that NASS received "confirmation" that John Doe 2 was in Miami, Florida, but that John Doe 2 planned to travel to New York City that evening. In a further text message, which I reviewed, NASS suggested that the Confidential Witness "mention" to John Doe 2 that the Confidential Witness knew John Doe 2 "was in Miami[,] as a way of showing you're keeping tabs.

Crim. Compl., ¶ 11.

This exchange, between Mr. Nass and the cooperating witness reveals how the government may be relying on protected speech within the "surveillance" prong of the charged Stalking statute. First, there are no allegations that Mr. Nass obtained this information by "plac[ing this person] under surveillance." 18 U.S.C. §§ 2261A(1) and 2261A(2). Mr. Nass may have heard it from

others or read a communication about it, which would not invoke the "surveillance" provision at all. Second, even the remark to the cooperating witness about telling John Doe 2 about "keeping tabs" on him is protected speech, since it does not communicate a "true threat" of bodily harm. Third, this is only one act and the statute requires a "course of conduct" as defined at 18 U.S.C. § 2266. At bottom, without alleging conduct of "surveillance" in the first place, this communication to the cooperating witness simply cannot form the basis of conduct prohibited by the statute's "surveillance" provision.

Without an additional showing of conduct alleged against Mr. Nass under the "surveillance" provision, this portion of the charges in Counts Four and Five must be stricken as failing to allege unprotected speech as-applied under the First Amendment and *Dennis,* 132 F.4th at 228-29.

## III. THE COURT SHOULD ORDER THE GOVERNMENT TO PROVIDE A BILL OF PARTICULARS: THE BARE STATUTORY LANGUAGE OF THE INDICTMENT DOES NOT PROVIDE MR. NASS WITH REQUISITE NOTICE OF THE CONDUCT UNDERLYING THE NEW YORK STATE PENAL LAW VIOLATIONS IN COUNTS TWO, THREE, AND SIX

Federal Rule of Criminal Procedure 7(c)(1) requires that an "indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged . . . ." Fed. R. Crim. P. 7(c); *accord Helbrans*, 547 F. Supp. 3d at 423-34 (the indictment's statutory language "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which with which he is charged.") (quotation marks and citations omitted). If the Indictment does not provide the requisite notice to a defendant regarding the factual underpinnings of the charges they face, Rule 7(f) provides that the accused has the right to seek "a bill of particulars in order to identify with sufficient particularity the nature of the charge[s] pending against him, thereby enabling [the] defendant to prepare for trial [and] to prevent

surprise." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987); *accord* Fed. R. Crim. P. 7(f).

Many of the Indictment's charges in Counts Two, Three, and Six, incorporating crimes under the New York Penal Law are inscrutable. Neither the government's charging documents nor the discovery it has produced fairly inform Mr. Nass of the factual allegations he will face at trial. The Indictment thus does not meet the basic notice requirements of Rule 7(c)(1). A bill of particulars is required to "prevent surprise" and "enable[e]" Mr. Nass to adequately "prepare for trial." *Bortnovsky*, 820 F.2d at 574.

Specifically, the Indictment's Count Two charging Use of Interstate Facilities to Commit Extortion, and Counts Three and Six charging Travel Act violations, all pursuant to 18 U.S.C. § 1952(a)(3)(A), each incorporate violations of five statutes: (1) attempted Hobbs Act extortion, in violation of 18 U.S.C. § 1951(a), and (2) four New York State Penal Law violations, criminalizing a broad range of conduct as larceny and extortion under New York Penal Law §§ 135.60, 155.30(6), 155.40(2), 155.05(2)(e).[8] *See* Indict. ¶¶ 2, 3, 6.

The Criminal Complaint only clarifies the factual allegations underpinning the government's theory of attempted Hobbs Act extortion in Count One, and repeated throughout the Indictment embedded in Counts Two, Three, and Six. The same cannot be said for the New York Penal Law charges. While the government is wrong about its attempted Hobbs Act extortion allegations, and while the charges will not withstand the crucible of trial, the factual allegations are at least comprehensible: the government asserts that Mr. Nass hired the government's

[8] The Indictment also charges aiding and abetting under New York Penal Law § 20.00. That charge is subject to dismissal for the same reasons as the remaining counts charged under 18 U.S.C. § 2. *See* supra § II.B.

cooperating witness in an attempt to extort funds from the alleged victims. *See* Criminal Compl. ¶¶ 3.

Mr. Nass does not have the same clarity regarding the New York Penal Law charges in Counts Two, Three, and Six. And during a June 16, 2026 meet and confer, the government specified which sub-sections of the New York Penal Laws the grand jury charged in the Indictment, but refused to provide any further details regarding the factual allegations it presented to the grand jury in securing the Indictment. Mr. Nass remains at a loss regarding many of the New York Penal Law charges he faces. For example:

- Several of the New York Penal Law charges require theft or stealing as a predicate. *See* NYPL §§ 144.30, 155.40; Indict. ¶¶ 2, 3, 6. But what is Mr. Nass alleged to have stolen? That factual foundation appears nowhere in the government's charging documents. And indeed, it is contrary to the otherwise available evidence produced in discovery. Mr. Nass was contractually entitled to the funds he allegedly sought pursuant to a lobbying contract signed by John Doe 1 in connection with his efforts to obtain early release from prison for criminal convictions (which were ultimately successful).
- A number of the New York Penal Law subsections require threatening the victim with criminal exposure, or publicizing a secret. NYPL §§ 135.60(4), (5), 155.05(2)(e)(iv), (v), Indict. ¶¶ 2, 3, 6. There are no specific factual allegations or clear evidence supporting a charge of attempting to make such threats. The Criminal Complaint focuses solely on the government cooperating witnesses' alleged discussions of violence. *See* Crim. Compl. ¶ 5 (government cooperating witness suggesting: "listen, if I need to sock him a few times . . ."); *id.* ¶¶ 10, 12. Nor is there any evidence in

discovery of alleged threats of criminal or factual exposure against the alleged victims—***to the contrary, there are no threats to the alleged victims at all in the discovery***.

- Finally, two of the New York Penal Law subsections in Counts Two, Three, and Six charge threats that Mr. Nass would "engage in some other conduct constituting a crime" or perform "another act" that would be to the alleged victims' detriment. *See* Indict. ¶¶ 2, 3, 6; NYPL §§ 135.60(3), (9), 155.05(2)(e)(iii), (ix). That there is neither specific evidence of other acts, criminal or otherwise, tending to harm the alleged victims, compounds the gaping question of what actions do these broadly-worded charges seek to criminalize here? With no direction in either the government's charging documents, or in the discovery, Mr. Nass is simply left to guess.

Because the broadly-worded, and non-specific New York Penal Law charges in the Indictment provide Mr. Nass with no notice of the conduct for which he is allegedly charged, and because the Criminal Complaint and discovery are similarly devoid of evidence providing Mr. Nass with the requisite notice, he is unable to adequately prepare for trial on Counts Two, Three, and Four. The Court should thus order the government to file a bill of particulars under Federal Rule of Criminal Procedure 7(f) detailing the factual allegations it presented to the grand jury regarding New York Penal Law §§ 135.60, 155.30(6), 155.40(2), and 155.05(2)(e).

### A. Counts Two, Three and Six Charge Violations of New York Extortion Statutes With Broadly-Worded, and Disparate Elements

The Indictment charges the following New York State Penal Law sections in Counts Two, Three, and Six:[9]

[9] This section addresses the specific subsections of the New York Penal Law that, during the June 16, 2026 meet and confer, the government identified as charged in the Indictment and thus

### 1. *NYPL § 135.60 - Coercion in the Third Degree* *NYPL § 155.05(2)(e) - Larceny; Defined*

New York Penal Law § 135.60 criminalizes coercion in the third degree, which is a Class A misdemeanor, as follows:

> A person is guilty of coercion in the third degree when he or she compels or induces a person to engage in conduct which the latter has a ***legal right to abstain from engaging in***, or to ***abstain from engaging in conduct in which he or she has a legal right to engage***, or compels or induces a person to join a group, organization or criminal enterprise which such latter person has a right to abstain from joining, or compels or induces a person to produce, disseminate, or otherwise display an image or images depicting nudity of such person or depicting such person engaged in sexual conduct as defined in subdivisions two and three of section 235.20 of this chapter, ***by means of instilling in him or her a fear that, if the demand is not complied with, the actor or another will***:
>
> 1. Cause physical injury to a person; or
>
> . . .
>
> 3. Engage in other conduct constituting a crime; or
> 4. Accuse some person of a crime or cause criminal charges to be instituted against him or her; or
> 5. Expose a secret or publicize an asserted fact, whether true or false, tending to subject some person to hatred, contempt or ridicule; or
>
> . . .
>
> 9. Perform ***any other act*** which would not in itself materially benefit the actor but which is calculated to harm another person materially with respect to his or her health, safety, business, calling, career, financial condition, reputation or personal relationships.[10]

---

presented to the grand jury.

[10] Although the New York and federal courts have not directly addressed the question, other courts have held that statutes materially identical to §§ 135.60, and 155.05(e)(2) are unconstitutionally overbroad because, on their face, they encompass substantial swaths of protected speech. *See, e.g., State v. Jorgenson*, 946 N.W.2d 596, 600, 602-03 (Minn. 2020) (holding that the Minnesota extortion statute was constitutionally overbroad because it "criminalize[d] a wide range of communications on a variety of subject matters. A communication is prohibited if it threatens to expose *any* secret or deformity, publish *any* defamatory statement (whether or not tortious), or otherwise expose *any* person to disgrace or ridicule. The communication is prohibited even if the secret or deformity is true, the defamatory statement is accurate, or the facts that might lead to disgrace or ridicule are real."); *State v. Weinstein*, 182 Ariz. 564, 565-68 (Ct. App. 1995) (affirming dismissal of prosecution for violating state extortion statute: "We conclude that A.R.S. section 13–1804(A)(6) encompasses a substantial amount of protected speech. . . . Accordingly, we hold that

NYPL § 135.60 (emphasis added).[11]

The Indictment's charges under NYPL § 155.05 require essentially the same elements as the charges under NYPL § 135.60:

> 1. A person steals property and commits larceny when, with intent to deprive another of property or to appropriate the same to himself or to a third person, he ***wrongfully takes, obtains or withholds*** such property from an owner thereof.
> 2. Larceny includes a wrongful taking, obtaining or withholding of another's property, with the intent prescribed in subdivision one of this section, committed in any of the following ways:
>
>    . . .
>
>    (e) By extortion.
>    A person obtains property by extortion when he compels or induces another person to deliver such property to himself or to a third person by means of instilling in him a fear that, if the property is not so delivered, the actor or another will:
>
>    (i) Cause physical injury to some person in the future; or
>
>    . . .
>
>    (iii) Engage in other conduct constituting a crime; or
>
>    (iv) Accuse some person of a crime or cause criminal charges or removal proceedings to be instituted against him or her; or
>
>    (v) Expose a secret or publicize an asserted fact, whether true or false, tending to subject some person to hatred, contempt or ridicule; or
>
>    . . .

---

A.R.S. section 13–1804(A)(6) is unconstitutionally overbroad. The trial court's decision to dismiss the extortion charge against Weinstein is affirmed."); *City of Seattle v. Ivan*, 71 Wash. App. 145, 153–54 (1993) ("The effect of the Seattle ordinance on speech is more than incidental; it could potentially prohibit a real and substantial amount of protected speech. The City claims it has a compelling interest in protecting its citizens from extortion-like threats, yet the ordinance is not so narrowly defined and prohibits many communications besides those extortionate in nature. Accordingly, the ordinance is overbroad on its face."); *State v. Robertson*, 293 Or. 402, 415, 435–36 (1982) (finding Oregon's extortion statute constitutionally overbroad, as it includes language purporting to criminalize efforts "to engage in conduct from which (the addressee) has a legal right to abstain, or to abstain from engaging in conduct in which he has a legal right to engage," which is identical to language in the NYPL §§ 155.05, and 135.60). The New York Penal Law sections encompassed in Counts Two, Three, and Six are subject to the same constitutional infirmities, requiring dismissal on this basis as well.

[11] That the government charged misdemeanors as predicate acts in Counts Two, Three, and Six reflects the weakness of their Indictment. They are truly grasping in an effort to find some crime to charge, and in so doing, they have, in many cases, stretched the law past its breaking point.

> (ix) Perform any other act which would not in itself materially benefit the actor but which is calculated to harm another person materially with respect to such other person's health, safety, business, calling, career, financial condition, reputation or personal relationships . . .

NYPL § 155.05 (emphasis added).

A prerequisite for any violation of New York Penal Law § 135.60 is an effort to coerce someone, either: (1) to do something that the intended victim has a legal right to abstain from, or (2) not to do something that the alleged victim has a legal right to do. That appears inconsistent with both the charging documents' allegations against Mr. Nass, and with the discovery. Mr. Nass is alleged to have undertaken efforts to recover funds that the alleged victims owed him under a lobbying contract. *See* Crim. Compl. ¶ 4 ("NASS told the Confidential Witness, among other things, that John Doe 1 owed NASS $500,000 for what NASS described as lobbying services rendered on behalf of John Doe 1 from approximately December 2025 to January 2026"). The government produced an executed contract between an alleged victim and Mr. Nass detailing payment obligations, and the work Mr. Nass would perform as a lobbyist.

Neither the charging documents nor the discovery contains evidence or factual allegations that Mr. Nass attempted to prevent the alleged victims from engaging in conduct they had a legal right to do. Similarly absent are allegations or evidence that Mr. Nass attempted to coerce the alleged victims to undertake conduct from which they had a legal right to abstain. The only factual underpinnings alleged in the Indictment and Criminal Complaint, or suggested in the discovery relate to payment under a validly executed contract—nothing indicates that the lobbying contract itself was invalid, or that payment was otherwise not contractually required.

The means of that coercion under subsections of NYPL § 135.60(1), (3), (4), (5), and (9), as well as under NYPL § 155.05(2)(e)(i), (iii), (iv), (v), and (ix) are also disparate, compounding the confusion. Most are also inconsistent with the charging documents' allegations and the

evidence produced in discovery.[12] Neither the Indictment, the Criminal Complaint, nor the discovery contain a whiff of evidence seeming to support the government's apparent allegations that Mr. Nass attempted to or otherwise actually did "instill . . . fear" in the alleged victims that he would: (a) engage in some other crime (to their detriment), (b) accuse someone of a crime (to the contrary, Mr. Nass' lobbying contract involved obtaining clemency or release from prison for an alleged victim); (c) expose or publicize a secret or fact; or (d) do anything else designed to harm an alleged victim. *See* NYPL § 135.60(3), (4), (5), and (9); 155.05(2)(e) (iii), (iv), (v), and (ix).

With no concrete understanding of the facts presented to the grand jury underlying these charges, and in the absence of discovery supporting these charges, Mr. Nass is left to blindly guess what the government's theory may be. He thus cannot adequately prepare for trial.

#### ***2. NYPL § 155.30 - Grand Larceny in the fourth degree, and NYPL § 155.40 - Grand larceny in the second degree.***

Counts Two, Three, and Six purport to incorporate NYPL § 155.30, Grand Larceny in the fourth degree, which provides:

> A person is guilty of grand larceny in the fourth degree ***when he steals property and*** when:
>
> . . .
>
> 6. The property, regardless of its nature and value, is obtained by extortion.

NYPL § 155.30 (emphasis added).

Similarly, NYPL § 155.40, Grand Larceny in the second degree, provides:

> A person is guilty of grand larceny in the second degree when such person ***steals property*** and when:
>
> . . .
>
> 2. The property, regardless of its nature and value, is obtained by extortion committed by instilling in the victim a fear that the actor or another person will (a) cause physical injury to some person in

[12] Only § 135.60(2)(1) appears consistent with the government's proffered factual theory of aiding and abetting attempted Hobbs Act Extortion. And, beyond the legal infirmities plaguing those charges, Mr. Nass is not guilty of that charge; he looks forward to vindicating himself at trial.

the future.

NYPL § 155.40 (emphasis added).

In addition to appearing to incorporate the broad and problematic definitions of extortion defined in NYPL §§ 135.60 and 155.05, the larceny statutes in NYPL §§ 155.30 and 155.40 require the defendant to "steal[] property" as a prerequisite to criminal liability. That additional element is wholly absent from the discovery or the charging documents—Mr. Nass is left wondering what factual information the government presented to the grand jury about "steal[ing]," or what evidence he may face at trial.

Although the attempted Hobbs Act extortion charges are legally insufficient, and factually inaccurate—Mr. Nass is not guilty, and will vindicate his innocence at trial—those charges are at least comprehensible based on the facts alleged in the Indictment and Criminal Complaint. *See, e.g.,* Crim. Compl. ¶¶ 3-12. The New York Penal Law charges alleging stealing, exposing a secret or crime, or committing some other amorphous harmful or criminal act are not. There are no specific factual allegations in the charging documents or in the discovery informing Mr. Nass of the conduct for which he is charged with violations NYPL §§ 135.60, 155.30(6), 155.40(2), and 155.05(2)(e).

Without notice of the basic information underlying the grand jury's charges, Mr. Nass simply cannot prepare for trial. The government should thus be required to provide a bill of particulars regarding Counts Two, Three, and Six.

### B. A Bill of Particulars is Required to Facilitate Mr. Nass' Fundamental Right to a Fair Trial

Under these circumstances, the Court should order a bill of particulars detailing the factual assertions presented to the grand jury regarding NYPL §§ 135.60, 155.30(6), 155.40(2), and 155.05(2)(e), as charged in Counts Two, Three, and Six. That is the minimum notice necessary to

ensure that Mr. Nass receives a fair trial, and is not "require[d] . . . to engage in guesswork to determine" the allegedly criminal conduct charged in the bare bones Indictment. *United States v. Vasquez-Ruiz*, 136 F.Supp.2d 941, 944 (N.D. Ill. 2001) (ordering a bill of particulars because "[t]here is no good reason to require the defendant to engage in guesswork to determine who the victims of the offense were, what bills the government will claim were false, and what tests it will claim were unnecessary); *accord United States v. Stringer*, 730 F.3d 120, 126 (2d Cir. 2013) (under certain circumstances, "specification of how a particular element of a criminal charge will be met (as opposed to categorical recitation of the element) is of such importance to the fairness of the proceeding that it must be spelled out in the indictment."); *Bortnovsky*, 820 F.2d at 574-75 (vacating mail fraud conviction for burglary where the district court refused to grant a bill of particulars, resulting in the defense preparing to defend against 15 burglaries when only four were alleged to be potentially fraudulent at trial); *United States v. Perry*, 30 F.Supp.3d 514, 525 (E.D. Va. 2014) (ordering the government to particularize those documents alleged to be falsified or altered in a health care fraud case);

Neither the Indictment nor the Criminal Complaint identify *what* actions constitute stealing, exposing a secret or crime, or committing some other amorphous harmful or criminal act, which form the basic elements of the New York Penal Law provisions charged in Counts Two, Three, and Six. *See* NYPL §§ 135.60, 155.30(6), 155.40(2), and 155.05(2)(e). And the discovery produced does nothing to fill in those holes. There is thus a real risk of trial by ambush against Mr. Nass—intolerable under Rule 7(f), and anathema to basic notions of fairness and due process. *See, e.g., United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990) ("a bill of particulars is [necessary] to provide defendant with information about the details of the charge against him if this is necessary to the preparation of his defense, and to avoid prejudicial surprise at the trial.")

(quoting 1 C. Wright, Federal Practice and Procedure § 129, at 434–35 (2d ed. 1982)); *accord United States v. Scully*, 108 F. Supp. 3d 59, 126 (E.D.N.Y. 2015) (ordering the Government to provide a bill of particulars stating the specific conduct underlying each count of the indictment).

*United States v. Gullett*, 713 F.2d 1203 (6th Cir. 1983), is instructive. *Gullet* involved multiple Travel Act counts corresponding to a variety of overt acts over a monthlong timeframe. In upholding those counts, the appellate court focused on the government's production of a bill of particulars, which clarified both the specific time period at issue in each count, and the overt acts that the Travel Act charges "corresponded to." *Id.* at 1212. Only with those details could the defendant in *Gullet* understand and defend against the indictment's charges. Mr. Nass is entitled to the same protection here. As in *Gullet*, he should know what specific conduct the government is charging as violations of NYPL §§ 135.60, 155.30(6), 155.40(2), and 155.05(2)(e). In *Gullet* "the bill of particulars was properly used to inform the defendant of the precise nature of the charges against him, to avoid or minimize the danger of surprise at trial, and to cure omissions of detail in order to facilitate a plea of double jeopardy in a subsequent prosecution for the same offense." *Id.* Mr. Nass should receive the same basic notice to protect his right to a fair trial in defense of his innocence against the charges.

The risk of ambush at trial is amplified further if the government can change its mind at the last moment as to what undisclosed factual allegations are implicated in the Indictment. While the government has identified three conversations allegedly constituting attempted Hobbs Act extortion, *see* Crim. Compl. ¶¶ 4-12, those do not meet the elements of the New York Penal Law charges requiring theft, threats of exposure, or other amorphous harmful acts towards the alleged victims. *See, e.g., United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988) (vacating conviction based on denial of a particulars request where "[]he indictment put[] Davidoff on notice

that he will be obliged to defend against extortionate schemes directed at one company," but "[a]t trial Davidoff [wa]s then confronted with evidence of extortions aimed at entirely different companies"); *cf. United States v. Yuan Zhong Zhao*, No. 18-CR-211 (LJV) (JJM), 2019 WL 7630633, at *6 n.1 (W.D.N.Y. June 12, 2019) (where "the government has made clear that the underlying falsehood is Lie Number 1 . . . and deviation from this theory at trial subjects it to risk of constructive amendment and prejudicial variance," the "defendant will not be going to trial with the chief issue undefined.") (quotation marks, citations and modifications omitted).[13] The Court should, therefore, order the government to provide a bill of particulars identifying the conduct based on which the grand jury charged Mr. Nass in Counts Two, Three, and Six.[14]

## IV. PER RULE 16 AND *BRADY* MR. NASS SHOULD RECEIVE BASIC TECHNICAL AND CUSTODIAL INFORMATION REGARDING THE GOVERNMENT'S FAILED ATTEMPTS TO RECORD HIS CONVERSATIONS WITH YJE COOPERATING WITNESS ON JANUARY 13, 2026 AND JANUARY 29, 2026

The Criminal Complaint, and the discovery received thus far make clear that the hallmark of the government's case are recordings of two in person meetings between the government's cooperating witness and Mr. Nass on January 8, 2026 and January 30, 2026. *See* Crim. Compl. ¶¶ 5, 6, 8, 9, 10, 12. Those recordings are so important that the government sought to have their

[13] Nor does this motion request a preview of the government's trial evidence; it seeks only the basic allegations of stealing, threats of criminal exposure for the alleged victims, threats of factual revelations, or other harm that the government is making against Mr. Nass. The particulars requests are consistent with the type of information that the government provided in *United States v. Wey*, which the court deemed sufficient to inform the defendant of the charges against him, obviating the need for a bill of particulars. *United States v. Wey*, No. 15-CR-611 (AJN), 2017 WL 237651, at *19 (S.D.N.Y. Jan. 18, 2017) (denying particulars request in fraud case where "the Government has spelled out the types of actions purportedly taken by Wey to manipulate the price of Issuer stock.").

[14] Should Mr. Nass prevail on this motion and the Court require the government to provide a bill of particulars, we preserve the right to file a future motion to dismiss pursuant to Federal Rule of Criminal Procedure 12(b), to the extent the charges are legally insufficient.

cooperating witness make more: on both January 13, 2026 and January 29, 2026, the government's cooperating witness, apparently in conjunction with federal law enforcement agents, sought to record telephone calls (on January 13), and a meeting (on January 29) with Mr. Nass. The discovery clarifies that although the government relies heavily on alleged statements during those conversations, additional recordings on January 13 and January 29 did not happen. The question is why not?

Over the last month, Mr. Nass has conferred closely with the government to understand whether a technical malfunction impeded the recording. Apparently not. The government's forensic examiners, a defense technical expert, and the device manufacturer could not find evidence of technical malfunctioning. Questions about why no recordings of the alleged conversations on January 13 and January 29 thus remain. Perhaps it was human error? Perhaps the tenor of the conversations were not as the government agents hoped, so nothing was recorded? We still do not know.

Either way, because the alleged conversations between Mr. Nass and the government cooperating witness are central to the case, he needs to know what happened to the recording device in the month of January 2026, and since then. In the midst of the cooperating witness' efforts to record their conversations—or at least some of them—information about who had the device, what they did with it, and what happened to it subsequently are crucial to Mr. Nass's ability to challenge the government's version of the conversations on January 13 and January 29. This discovery is thus essential to Mr. Nass' ability to prepare a fulsome defense.

In an effort to resolve this issue amicably, Mr. Nass has conferred with the government several times in the month of June, seeking specific categories of information about technical questions, and the device's handling. The government has provided some limited information

about the technical tests the FBI CART team has run, an overview of the results of manufacturer's test, and an opportunity for a defense expert to observe the FBI CART team's work plugging the device into the CART software (although not to the proprietary software for the device).

Nonetheless, broad categories of information are missing from the government's Rule 16 production. These include: (1) technical specifications and protocols of how the device should have been operated and downloaded, and how those were followed; and (2) chain of custody information regarding the device, and any recordings on the device, including who operated and downloaded the device on January 8, 2026 (successful recording), January 13, 2026 (unsuccessful recording), and January 29, 2026 (unsuccessful recording).

Specifically, as Mr. Nass requested directly from the government in a June 12, 2026 letter, we request the following information to prepare a complete defense:

1. Any and all file logs, or screen shots of the same, removed from the alleged "malfunctioning" recording device. These include files listings, or indices, that identify file names and/or metadata residing on the device. In the alternative, we seek an affirmation or notice that when the device is connected to a computer with the device's operating software that the software does not recognize the device, or there is some other indication of a files system corruption.

2. Any and all FD-302 and FD-1023 reports documenting the investigative activities of FBI agents and debriefings of the cooperating witness ("CW") after interactions with Mr. Nass on or about January 13, 2026 and January 29, 2026, related to the attempted consensual recording sessions.

3. Any and all electronic communications by FBI agents, federal prosecutors and/or other federal law enforcement officers related to the attempted consensual recording session between CW and Mr. Nass on or about January 13 and 29, 2026.

4. Any and all inserts to federal law enforcement and FBI reports containing administrative or non-investigative information related to the attempted consensual recording sessions between CW and Mr. Nass on or about January 13 and 29, 2026.

5. Any and all handwritten agent notes by FBI or other law enforcement officers related to the attempted consensual recording sessions between CW and Mr. Nass on or about January 13 and 29, 2026.

6. Any and all documents recording the chains of custody for all electronic evidence recovered or attempted to be recovered from consensual recording operations between CW and Mr. Nass on or about January 13 and 29, 2026.

Documents and information explaining how and why the recording device did not record the alleged conversations between Mr. Nass and the cooperating witness on January 13 and January 29 are crucial to the defense here—they go to the heart of undermining the government's narrative about the attempted aiding and abetting extortion charged. They are thus discoverable under Rule 16. *See* Fed. R. Crim. P. 16(a)(1)(E)(i) ("Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, . . . or copies or portions of any of these items, if the item is within the government's possession, custody, or control and: (i) the item is material to preparing the defense"); *accord United States v. Murphy*, No. 120CR00049RJAMJR, 2022 WL 19003378, at *7 (W.D.N.Y. Sept. 23, 2022) ("the Government states that it has fully complied with its obligations under Rule 16. The Government affirms that it has already provided defendant with substantial voluntary discovery and that it will continue to provide any additional discoverable materials that become available. It specifies that it has provided all chain of custody documents . . .) (citations omitted); *United States v. Cabrera*, No. 17-CR-202-EAW-MJR, 2018 WL 4328027, at *5 (W.D.N.Y. Aug. 8, 2018) (government complied with Rule 16 when "[t]he Government also represented that it provided photographs, laboratory reports and chain of custody reports")

And because the documents and information requested are unquestionably in the government's possession, and raise real questions about the veracity of the government's theory predicated on the January 13 and January 29 conversations, *Brady v. Maryland,* 373 U.S. 83, (1963), also require their prompt disclosure. Thus, because trial is fast approaching the Court should order expeditious disclosure of this information regarding the use and maintenance of the recording device in January 2026, and since then. That is necessary to ensure Mr. Nass has a full

opportunity to utilize the information for his defense investigation in advance of trial. *See, e.g., United States v. Rittweger,* 524 F.3d 171, 181 n.4 (2d Cir. 2008) ("Complying with the Jencks Act ... does not shield the government from its independent obligation to timely produce exculpatory material under *Brady*—a constitutional requirement that trumps the statutory power of 18 U.S.C. § 3500."); *United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007) (per *Brady*, the government's disclosures must "give[ ] the defendant a reasonable opportunity either to use the evidence in the trial, or to use the information to obtain evidence for use in the trial.") (quotation marks omitted); *DiSimone v. Phillips*, 461 F.3d 181, 197 (2d Cir. 2006) (*Brady* requires that "the defense [have an] opportunity to use the evidence when disclosure is made.").

## V. CONCLUSION

For the reasons stated above, Defendant Joshua Nass respectfully requests that this Court grant his motions and: (1) dismiss the Indictment's charges as legally insufficient; (2) order the government to file a bill of particulars with respect to Counts Two, Three, and Six; and (3) order the government to provide limited and specific additional discovery regarding its apparent failed efforts to record conversations between its cooperating witness and Mr. Nass on January 13, 2026 and January 29, 2026.

Dated: June 26, 2026
New York, New York

Respectfully submitted,

MEISTER SEELIG & SCHUSTER PLLC

By: /S/

Henry E. Mazurek
Ilana Haramati
125 Park Avenue, Suite 700
New York, New York 10017
hem@mss-pllc.com
ih@mss-pllc.com

*Counsel for Defendant Joshua Nass*